## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

CHARLES B. SILLS,

       Plaintiff,

    vs.                                CIVIL NO. 11-793 CG

MICHAEL J. ASTRUE, Commissioner
 of the Social Security Administration,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff Charles B. Sills' *Motion to Reverse and Remand for a Rehearing with Supporting Memorandum*, (Doc. 19), Defendant's *Response to Plaintiff's Motion to Reverse or Remand*, (Doc. 20), and Plaintiff's *Reply to Defendant's Response to Motion to Reverse or Remand*, (Doc. 21).

Charles Sills is a middle-aged man who applied for Supplementary Security Income on January 16, 2008. Administrative Record ("AR") at 157. He alleges that he has been disabled since that date due to a variety of physical and mental impairments. (*See, generally*, Doc. 19). Administrative Law Judge ("ALJ") Ben Willner denied benefits on November 12, 2010. AR at 14-22. Mr. Sills contends that the ALJ failed to appropriately weigh the medical findings of his social worker, Brooks Bedwell, as they related to the limiting effect of Mr. Sills' mental impairment. (Doc. 19 at 11-17). The Commissioner maintains that the ALJ properly considered all of the medical records regarding Mr. Sills' mental impairment. (Doc. 20 at 4-15).

Having considered the parties' filings, the relevant law, and having meticulously reviewed and considered the entire administrative record ("AR"), the Court finds that the

ALJ did not apply the correct legal standards in Mr. Sills' case. The Court will therefore **REMAND** the case to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

I.      <u>Standard of Review</u>

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992)). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214; *Doyal*, 331 F.3d at 760. An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214. While a court may not re-weigh the evidence or try the issues de novo, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order

2

to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II.   <u>Applicable Law and Sequential Evaluation Process</u>

For purposes of disability insurance benefits (DIB) and supplemental security income (SSI), a person establishes a disability when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 405.1505(a), 416.905(a).

In light of this definition for disability, a five-step sequential evaluation process (SEP) has been established for evaluating a disability claim. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the SEP, the claimant has the burden to show that: (1) he is not engaged in "substantial gainful activity." At the second step, the claiming must show that (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) his impairment(s) either meet or equal one of the "Listings"[1] of presumptively disabling impairments; or (4) he is unable to perform his "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*,

---

[1] 20 C.F.R. pt. 404, subpt. P, app. 1.

399 F.3d at 1261.  At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity, age, education, and work experience.  *Grogan*, 399 F.3d at 1261.

###### III.   Background

###### a.   Medical Background

###### i.   Physical Impairments

Mr. Sills is a middle-aged man who is approaching fifty years of age. He has suffered from cerebral palsy since birth which resulted in a number of physical abnormalities, including a left leg that is several inches shorter than his right leg. AR at 345-46. He was in a wheelchair as a child but had multiple surgeries on his left leg and left Achilles tendon which enabled him to ambulate effectively. *Id.* at 47-48, 346. In addition to the cerebral palsy, Mr. Sills has been treated for chronic prostatitis, sliding inguinal hernias, and a seizure disorder. *Id.* at 344, 347, 352, 380. Both the seizure disorder and prostatitis appear to be well-controlled through medication. *Id.* at 348, 352, 380, 384, 387.

###### ii.   Mental Impairment

In addition to the Mr. Sills' physical impairments, he was diagnosed as suffering from bipolar disorder in 2009. *Id.* at 513; 646. The majority of his health care at that time was provided by the St. Martin's Hospitality Center of Albuquerque, Albuquerque Health Care for the Homeless ("HCH"), and the University of New Mexico Health Center. *Id.* at 513.

During a screening appointment at HCH in May of 2009, the reviewing counselor stated that Mr. Sills' speech was pressured and excessive and that he appeared hypo-

manic. *Id.* at 524.[2] He appeared to have memory problems and had inappropriate thought process. *Id.* at 525. The counselor assigned Mr. Sills a Global Assessment of Functioning ("GAF") score of 55. *Id.* at 527.[3] Tina Carlson, an advanced practitioner registered nurse, was his primary care provider at HCH and managed his medication. She found that his insight and judgment could be good on some days and poor on others. *Id.* at 501, 510, 513, 655. She stated that he had poor short and long-term memory and found that he could be hostile, paranoid, and distractable at times. *Id.* at 527, 656. She saw him between July of 2009 and January of 2010 but then did not treat him again until June of 2010 because he missed multiple appointments. *Id.* at 478, 513, 656.

Pressured speech, poor memory, poor insight and thought processes, and labile mood and affect were frequently noted by various clinicians, nurses, and social workers through 2009 and 2010. *See, e.g.*, *Id.* at 492, 500, 521, 609-12, 615-17, 620-21, 634-36. Treating sources consistently noted that Mr. Sills would talk incessantly during checkups or counseling sessions and that they had to constantly refocus his attention. *Id.* at 344, 527, 634. Mr. Sills was frequently described as "manic" in treatment notes. *Id.* at 527, 538-40.

### iii.    Consultative Exams and Residual Functional Capacity Assessments.

Following his application for supplement income benefits, Mr. Sills was referred to

---

[2] Pressured speech refers to an unusual increase in the rate of speech or conversation beyond what is considered normal or appropriate. Those exhibiting pressure of speech can be difficult to interrupt and often appear to be jumping from topic to topic. *See, e.g.*, http://www.bipolardisordersymptoms.info/bipolar-symptoms/pressure-of-speech.htm.

[3] The GAF is a subjective determination based on a scale of 100 to 1 of "the clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (Text Revision 4th ed. 2000) (*DSM-IV*). A GAF score of 51-60 indicates "moderate symptoms," or "moderate difficulty in social, occupational, or school functioning."

several doctors by the Disability Determination Services ("DDS") for consultative examinations.[4] Among them was Dr. Harry Burger, who assessed Mr. Sills' physical limitations on February 16, 2008. *Id.* at 344. Noting that Mr. Sills was capable of ambulating effectively despite having a shorter left leg, Dr. Burger found that the cerebral palsy did not functionally prevent him from maintaining gainful employment. *Id.* at 344-48. He similarly found that the hernias, prostatitis, and seizure disorder did not significantly restrict Mr. Sills' ability to work because the conditions were being effectively treated or were in remission. *Id.* During the examination, Mr. Sills told Dr. Burger that he worked odd jobs and could continue to do so but that he "doesn't work more in order to get Social Security." *Id.* at 345.

 Dr. Burger's examination occurred prior to Mr. Sills being diagnosed with bipolar disorder. Nevertheless, Dr. Burger did opine generally on Mr. Sills' mental state, noting that he was incredibly talkative and had to be interrupted frequently. *Id.* at 344-45. He stated that Mr. Sills "apparently remembers well and has been educated to some degree in this regard despite his original complaints of memory and concentration problems." *Id.* at 345. He described Mr. Sills as "relatively alert, oriented and mentally sharp today." *Id.* at 347.

Brooks Bedwell, a social worker at St. Martin's Hospitality Center provided psychotherapy counseling to Mr. Sills on a weekly basis for four months in 2009 at St. Martin's Hospitality Center. *See, e.g.*, *Id.* at 587, 589, 591, 593. Mr. Bedwell provided both individual and group counseling to Mr. Sills. *Id.* at 50-51. Mr. Bedwell prepared a Mental Residual Functional Capacity Assessment in 2010 which painted a far grimmer picture of

---

[4] Disability Determination Services is the state agency with which the Social Security Administration has contracted to develop the medical record in Social Security claims at the initial and reconsideration levels. See 20 C.F.R. § 404.1519s.

Mr. Sills' mental health compared to Dr. Burger's analysis. *Id.* at 648-49, 652-53. Mr. Bedwell found that Mr. Sills was markedly limited in many important categories, including his ability to i) maintain attention and concentration for extended periods, ii) to sustain an ordinary routine without special supervision, iii) to work in coordination with others without being distracted by them or displaying behavioral extremes, iv) to work at a consistent pace without interruption from psychologically based symptoms, and v) to make simple work-related decisions. *Id.* at 648-49. He also found that Mr. Sills was moderately limited in other respects, including his ability to accept instruction and criticism from supervisors and to maintain socially appropriate behavior. *Id.* at 649. Mr. Bedwell provided a narrative explanation, stating that Mr. Sills

> [H]as difficulty understanding and interpreting what people are saying. He occasionally takes things the wrong way and usually blows them out of proportion . . . [He] has marked difficulties with concentration and persistence . . . His personality and personality traits are grating and he constantly tries to talk over others who are talking. This annoys most people who work with him. His judgment is terrible. Mr. Sills will make decisions with little thought and great impulse and either ignores or is oblivious to the consequences of his decisions or their (often negative) effects on others . . . He fears change and goes out of his way to avoid or prevent it. His personality is rigid and he lacks even basic insight into his inappropriate and self-defeating behaviors.

*Id.* at 652-53.

Although DDS and Mr. Sills' own attorney attempted to have other doctors and treating sources fill out medical evaluations and residual capacity forms, few other doctors agreed to do so since Mr. Sills repeatedly missed the relevant appointments. *Id.* at 358-371, 478, 487-90. This comported with Mr. Bedwell's finding that since Mr. Sills "has lived for so long with little or no schedule that times and schedules mean little to him . . ." *Id.* at 652.

b.      **Hearing Before the ALJ**

Mr. Sills appeared before ALJ Willner on June 15, 2010, in Albuquerque, New Mexico. *Id.* at 27. A Vocational Expert ("VE") named Pamela Bowman was present at the hearing. *Id.* Mr. Sills testified that he left school in the ninth grade and that he had not worked for many years. *Id.* at 35, 39. Mr. Sills applied to multiple vocational schools and programs but he either failed to complete the program or was rejected for lack of mental aptitude. *Ia.* at 35-36, 47. Mr. Sills stated that he was homeless in 2008 and 2009 but that he eventually found transitional housing though St. Martin's Hospitality Center in 2009.

Mr. Sills testified that his cerebral palsy and bipolar disorder were the most significant impediments to him obtaining gainful employment. *Ia.* at 44. Mr. Sills said that the two disorders deleteriously affect his ability to concentrate and pay attention. *Id.* at 52-53. He has difficulty controlling his temper and has problems being around other people in a work environment. *Id.* at 53. He gets agitated and stressed easily and this leads to migraine headaches which he described like "a sledgehammer against my head." *Id.* at 53-55. He also complained about severe side-effects from the medications prescribed to treat his bipolar disorder, including depression, suicidal ideation, and weight gain. *Ia.* at 44-46. He testified that he was doing much better after recently changing medications. *Ia.* at 44-45, 52.

Following Mr. Sills' testimony, the ALJ posed a hypothetical question to the VE regarding Mr. Sills' ability to work. He asked her to imagine a claimant with Mr. Sills' work and medical history who had the following restrictions: i) he was restricted to work at a medium exertional level, ii) he could occasionally crawl or climb ladders, ropes, or scaffolding, iii) he must avoid concentrated exposure to hazards such as dangerous

8

machinery or unprotected heights, and iv) he is limited to unskilled work involving only simple tasks and instructions. *Id.* at 57-58. Ms. Bowman testified that a claimant with those restrictions would be capable of working as a Caretaker (odd job worker), Industrial Cleaner, and Cleaner/Polisher. *Id.* at 57-59.

### c.   ALJ's Decision

The ALJ rendered his decision denying Mr. Sills' application for benefits on November 12, 2010. *Id.* at 21. At step one of the sequential evaluation process, he found that Mr. Sills was not engaging in substantially gainful activity. *Id.* at 15. At step two he found that Mr. Sills had the following severe impairments: chronic prostatitis, cerebral palsy, status post bilateral inguinal hernia, and bipolar disorder. *Id.* At the third step of the process he found that Mr. Sills' impairments did not meet any of the listed impairments which would entitle him to an immediate award of disability benefits. *Id.* at 16-17.

With regard to Mr. Sills' bipolar disorder, the ALJ acknowledged that Brooks Bedwell had found Mr. Sills to be markedly limited in his ability to interact and perform appropriately in a work environment. *Id.* at 16. He nevertheless concluded that "my evaluation of the record finds the claimant's restrictions, as supported by the greatest weight of the evidence, are more consistent with "moderate" limitations." *Id.* The ALJ acknowledged that Mr. Sills has difficulty in social interactions but stated that "I do not find his problems any more than mild limitations [in social functioning]." *Id.*

The ALJ assessed Mr. Sills' residual functional capacity ("RFC") prior to step four of the sequential evaluation process. *Id.* at 17. He echoed the same physical limitations described in his hypothetical question to the VE. *Id.* More importantly, he found that Mr. Sills was limited to performing simple tasks with simple instructions, and that he could

maintain concentration, persistence, and pace for only two hours at a time. *Id.* He again acknowledged the mental functional limitations described by Brooks Bedwell but he chose to afford them less weight since Mr. Bedwell is not an acceptable medical source under Social Security regulations. *Id.* at 18. He chose instead to give great weight to Dr. Burger's 2008 consultative report. *Id.* at 18-19 (describing Dr. Burger's report as "thorough and very enlightening"). The ALJ twice noted that Mr. Sills had admitted to Dr. Burger that he was capable of working but chose not to because he did not want to jeopardize his chances of obtaining social security benefits. *Id.* at 19.

Having established Mr. Sills' RFC, the ALJ found that Mr. Sills had no past relevant work at step four. *Id.* At step five the ALJ found that there were other jobs with sufficient numbers in both the national and regional economy which Mr. Sills could perform. *Id.* at 20. He agreed with the VE's testimony that Mr. Sills was capable of working as a Caretaker (odd job worker), Industrial Cleaner, and Cleaner/Polisher. *Id.* Having found that Mr. Sills retained the residual functional capacity to find work in the local economy, the ALJ determined that Mr. Sills was not disabled. *Id.*

## IV.   Analysis

Mr. Sills' primary contention is that the ALJ failed to appropriately weigh Brooks Bedwell's medical records and RFC assessment in determining the vocational limitations resulting from Mr. Sills' bipolar disorder. (Doc. 19 at 11-15).[5] Relatedly, Mr. Sills argues that

---

[5] Mr. Sills also claims that the ALJ failed to appropriately weight Nurse Tina Carlson's medical records from HCH. (Doc. 19 at 11-15). Contrary to Mr. Sills' contention, the ALJ did not explicitly reject any medical opinion rendered by Nurse Carlson. In fact, the ALJ did not reference Nurse Carlson at all except to state generally that he had considered the medical records from HCH. AR at 19. In considering the functional limitations caused by Mr. Sills' bipolar disorder, the ALJ considered, and ultimately rejected, only Mr. Bedwell's opinion. *Id.* at 19 (stating that he

the ALJ's RFC assessment was not supported by substantial evidence because it did not incorporate Mr. Bedwell's findings of multiple marked limitations in the work setting and the plethora of evidence from St. Martin's and HCH documenting Mr. Sills' mental limitations. *Id.* at 15-17.

The Commissioner counters that the ALJ's choice to afford Bedwell's opinions little weight was proper because Bedwell did not qualify as an acceptable medical source under Social Security Regulations. (Doc. 20 at 4-8). He notes that the regulation governing the consideration of non-medically acceptable sources is permissive, rather than mandatory. (*Id.*). He further argues that, even when the ALJ does consider the opinions of non-medically acceptable sources, the ALJ "need not explain his reasons for according it little weight." (*Id.* at 5). He therefore argues that the ALJ's decision to reject Bedwell's opinion was permissible and that the RFC was supported by substantial evidence.

### a.    Law Regarding Non-Medically Acceptable Opinions

The regulation clarifying how ALJ's should consider opinions from non-medically acceptable sources was published in August of 2006. SSR 06-03p.[6] Pursuant to the regulation, only physicians, psychologists, optometrists, podiatrists, and similarly licensed medical professionals are considered "acceptable medical sources." *Id.*; *see also* 20 C.F.R. § 416.913(a). Since Mr. Bedwell is a clinical social worker, he does not qualify. For the

---

afforded less weight to the opinion of the licensed social worker/therapist at St. Martin's); *Id.* at 20.

[6] Though social security rulings do not necessarily carry the force of law, they are entitled to deference. *See Fagan v. Astrue*, 231 F.App'x 835, 837 (10th Cir. 2007). Indeed, the particular strictures of SSR 06-03p have been explicitly endorsed by the Tenth Circuit in several opinions. *See Bowman v. Astrue*, 511 F.3d 1270, 1274 (10th Cir. 2008)*; Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007).

purposes of disability applications, only acceptable medical sources can, i) establish the existence of a medically determinable impairment, ii) provide medical opinions, and iii) be considered a "treating physician." *Id.*

Notwithstanding the deference afforded to acceptable source opinions, the Social Security Administration has made clear that non-acceptable medical sources such as nurse practitioners and clinical social workers provide valuable and critical insight into a claimant's medical condition:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06-03p. While nurses and social workers may not establish the existence of a medical condition, their opinions are important in determining the severity of a properly diagnosed condition and the degree to which it affects "the individual's ability to function." *Id.*

When considering what weight, if any, to afford "other source" opinions, ALJ's are instructed to consider the same six factors typically used to evaluate the weight of an acceptable medical source's opinion. *Id.* These factors include, i) whether the source has personally examined the claimant, ii) the length of treatment, nature and extent of the treatment, iii) supportability of the opinion by reference to relevant evidence, iv) consistency of the opinion with the record as a whole, v) the source's medical specialization, and vi) any other factor which tends to support or refute the opinion. 20 C.F.R. § 416.927. The Administration has made clear that, after applying the six-factor test to the facts of a

particular case, the opinion of a nurse practitioner or social worker may outweigh the opinion of a doctor or other acceptable medical source. SSR 06-03p ("[I]t may be appropriate to give more weight to the opinion of a [non-medically acceptable source] if he or she has seen the individual more often than the treating source and has provided better explanation of his or her opinion.").

> **b.** **Application to Mr. Sills' Case**

In his decision denying benefits, the ALJ considered Mr. Bedwell's finding of marked limitations in concentration, persistence, and pace, but ultimately rejected those findings. AR at 16. The ALJ chose to afford Bedwell's opinion and RFC assessment "less weight" because Bedwell was not an acceptable medical source. *Id.* The critical question is whether the ALJ properly explained and supported his decision for rejecting Mr. Bedwell's opinion.

The Commissioner first agues that ALJ was under no duty to explain why he chose to afford little weight to Bedwell's opinion and RFC assessment. (*See* Doc. 20 at 5 ("[W]hile [the ALJ] must "consider" the opinion of an other source, he need not explain his reasons for according it little weight.")). In support, he cites to two Tenth Circuit cases, *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003); *Conger v. Astrue*, 2011 WL 6881902, at *2 (10th Cir. Dec. 30, 2011) (unpublished). The Court is not persuaded.

First, the Court does not agree that *Doyal v. Barnhart* stands for the proposition that an ALJ may reject a treating source's opinion without explaining why. In *Doyal*, the claimant argued that the ALJ failed to give controlling weight to her treating physician's opinion regarding her physical limitations. *Doyal*, 331 F.3d at 761-62. The Tenth Circuit found that the physician in question did not qualify as a treating physician and therefore "the ALJ was not required to give Dr. Webb's opinion controlling weight, *or to give specific reasons for*

*not giving it controlling weight.*" *Id.* at 764 (emphasis added). However, the Court reaffirmed that "the ALJ was still required to consider [Dr. Webb's] opinion and to provide specific legitimate reasons for rejecting it" *Id.* (internal citations and quotations omitted).

The Court's decision in *Doyal* is consistent with Social Security Regulations and Tenth Circuit caselaw regarding an ALJ's duty to explain why he does or does not accept a medical opinion. Social Security Regulation 06-03p not only encourages ALJ's to consider medical opinions from "other sources", but further instructs adjudicators to "explain the weight given to opinions from these "other sources" or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." SSR 06-03p, *see also Bowman v. Astrue*, 511 F.3d 1270, 1274 (10th Cir. 2008) (noting that SSR 06-03p "requires ALJs to explain the weight given to other [other source] opinions or provide a discussion of the evidence in the decision which allows a reviewer to follow the ALJ's reasoning when such opinions may have an effect on the outcome of the case."). This duty is commensurate with the ALJ's more generalized duty to "discuss the uncontroverted evidence he chooses not to rely on, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).

In this instance, the ALJ failed to adequately explain why he was rejecting Mr. Bedwell's opinion and RFC assessment. In his opinion denying benefits, the ALJ acknowledged that Mr. Bedwell had found Mr. Sills to be markedly limited with regard to "both concentration, persistence and pace." *Id.* at 16.[7] The ALJ nevertheless rejected

---

[7] This description understates the severity of the limitations described in Mr. Bedwell's report. The ALJ acknowledged at Mr. Sills' hearing that he would have to find Mr. Sills disabled

Bedwell's RFC, noting that "my evaluation of the record finds the claimant's restrictions, as supported by the greatest weight of the evidence, are more consistent with "moderate" limitations." *Id.* Similarly, the ALJ stated that Mr. Sills "experiences some difficulties in social interaction but I do not find [that] his problems impose any more than mild limitations." Other than claiming to rely on the "greatest weight of the evidence," ALJ Willner cites to no specific doctor's findings or medical report to support his decision to afford little weight to Mr. Bedwell's assessment of multiple marked limitations. Neither does he cite to any personal observation of Mr. Sills' behavior or medical evidence which contradicts Mr. Bedwell's assessment. The ALJ did not discuss any of the six factors listed at 20 C.F.R. § 416.927 when rejecting Mr. Bedwell's RFC assessment.

The Commissioner contends that the ALJ did provide adequate explanation for his decision to reject Mr. Bedwell's opinion. Specifically, he claims that the ALJ "tethered his findings [with regard to Mr. Sills' mental health limitations] to the opinion of Dr. Burger, D.O., who examined Plaintiff and opined that he did not exhibit cognitive limitations." (Doc. 20 at 6). The Court disagrees. First, Dr. Burger examined Mr. Sills one time in February of 2008, at least a year before Mr. Sills was diagnosed with bipolar disorder. AR at 344. The Court fails to see how Dr. Burger could have provided an adequate assessment of a severe impairment which had yet to be diagnosed. More importantly, the ALJ's opinion does not indicate that he relied on Dr. Burger's report in assessing Mr. Sills' mental limitations. The ALJ never discussed Dr. Burger's comments regarding Mr. Sills' concentration or mental acuity. *Id.* at 18-19. Rather, the ALJ referred to Dr. Burger's report only when discussing

---

if he accepted Mr. Bedwell's RFC assessment since the marked limitations found therein would prevent "a person [from] perform[ing] any competitive work." AR 59-60.

15

the physical limitations resulting from Mr. Sills' prostatitis, cerebral palsy, and seizure disorder. *Id.*

The ALJ's failure to provide a clear reason for rejecting Mr. Bedwell's opinion constitutes reversible error since the record is not "sufficiently specific to make clear to any subsequent reviewer the weight the adjudicator gave to the . . . opinion and the reasons for that weight." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). The Court is left with no guide by which to assess the ALJ's decision to reject Mr. Bedwell's opinion except the ALJ's subjective belief that Mr. Sills' mental impairment was not quite so disabling. This error was neither harmless nor of minor importance. Mr. Bedwell was one of the few treating sources who actually saw Mr. Sills on a consistent basis. AR at 588-609. The bulk of the medical evidence from HCH and St. Martin's tends to confirm Mr. Bedwell's conclusion that Mr. Sills has significant difficulties interacting appropriately with peers and conducting himself in an appropriate manner. There are no records from acceptable medical sources which contradict Mr. Bedwell's findings. This is significant and the Tenth Circuit has held that ALJ's should pay even closer attention to the opinions of "other sources" where the claimant does not have a treating doctor. *See, e.g.*, *Frantz v. Astrue*, 509 F.3d 1299 (10th Cir. 2007) (Remanding because the ALJ failed to properly explain why he rejected the opinion of a nurse practitioner who had consistently treated claimant in favor of two examining physicians who saw claimant only once).

Because the ALJ has not provided clear reasoning to support his decision to reject Mr. Bedwell's opinion, the Court cannot say whether he appropriately weighed Mr. Bedwell's opinion and RFC assessment in deciding whether Mr. Sills retained the residual capacity to work. On remand, the ALJ should consider Mr. Bedwell's opinion and RFC

assessment in conjunction with the "other source" records provided from St. Martin's and HCH as well as the six factors established at 20 C.F.R. § 416.927 for weighing medical opinions.

**IT IS THEREFORE ORDERED** that Plaintiff Charles B. Sills' *Motion to Reverse and Remand for a Rehearing with Supporting Memorandum*, (Doc. 19), is hereby **GRANTED**. This matter shall be remanded to the Commissioner of Social Security for a hearing consistent with this Memorandum Opinion and Order.

_____
THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE

17